2023 IL App (1st) 160498

SIXTH DIVISION
August 11, 2023

No. 1-16-0498

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13 CR 09909-02 |
| | ) | |
| | ) | |
| ANGELA PETROV, | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, Angela Petrov was convicted of four counts of first degree murder of her five-month-old daughter under a theory of accountability. Petrov now appeals and argues (1) the State failed to prove her guilty beyond a reasonable doubt, (2) trial counsel was ineffective, and (3) the trial court erred when it relied on her personal knowledge of the nature and dynamics of domestic violence to discredit her testimony. For the following reasons, we reverse and remand for a new trial before a different judge.

¶ 2                                                     BACKGROUND

¶ 3     Petrov was tried in a simultaneous but separate bench trial with codefendant Rodrigo Rodriguez for the murder of their five-month-old daughter, Angelina Rodriguez. Both were found guilty of first degree murder. Petrov was sentenced to an extended term of 75 years' imprisonment. We affirmed codefendant's conviction, and his petition for leave to appeal to the Illinois Supreme Court was denied (*People v. Rodriguez*, 2019 IL App (1st) 153555-U, *appeal denied*, No. 125886 (Ill. May 27, 2020)).

¶ 4     In April 2013, Petrov, then 23 years old, was living in a one-bedroom apartment on Chicago's northwest side with her boyfriend Rodriguez and her three children. Two of Petrov's three children, Z.R., age two, and Angelina, age five months, were Rodriguez's biological children. Petrov's oldest son, A.P., was six years old and had a different father.

¶ 5     On April 11, 2013, at 12:21 p.m., Petrov made a call to 911 from her apartment. The State played the audiotape of the 911 call received by 911 operator Charles Reed. On the tape, a woman stated that her five-month-old baby "seems to be breathing but she's not crying or moving around, she's like really stiff right now," and "her arms are stuck straight, and her eyes are open" and "looking straight ahead." The woman stated that she was scared because "this is not normal." An advanced life support ambulance was dispatched to 2555 West Fitch Avenue, Apartment 109, in Chicago.

¶ 6     The ambulance arrived at Petrov's apartment a few minutes later. Paramedic Barbara Enos testified that she and her partner were met at the door by Rodriguez. When Enos entered the apartment, she saw Angelina lying on the couch in the living room with a wet blanket next to her. Enos stated that Angelina's arms were "stiff" and her legs "were straight and her feet were pointed down." Angelina's skin color was "ashen," and she felt "cool." She was also completely

unresponsive. Petrov told Enos and her partner that Angelina had woken up at 7 a.m. and was crying. Petrov gave Angelina a bottle and put her back down for a nap. At 11 a.m., Petrov checked on her and found her stiff and unresponsive. Petrov proceeded to throw water on Angelina's face. Petrov denied that any trauma had occurred to Angelina before the paramedics were called to her apartment.

¶ 7     Angelina was transferred by ambulance to St. Francis Hospital in Evanston, Illinois. Petrov accompanied Angelina. Angelina was treated in the emergency room by Dr. Halleh Akbarnia. Dr. Akbarnia testified that Angelina was in "significant distress," was "posturing," and had a "dusky look about her," and her pupils were "constricted and non-reactive." The paramedics were aiding her respiration with a bag valve mask because she had a "heart rate in the 60s" and had "very low oxygen." Dr. Akbarnia was concerned about whether there had been some type of trauma such as a head injury or a medication overdose that caused Angelina's low oxygen levels. She was also concerned about possible seizure activity.

¶ 8     After Angelina was placed on a ventilator and stabilized, Dr. Akbarnia spoke to Petrov to find out what happened so that she could determine a treatment plan. Petrov told Dr. Akbarnia that Angelina appeared normal before bed the previous night. Angelina went to sleep and awoke at 7 a.m. Petrov gave Angelina a bottle and placed her back down for a nap. Then, at 11 a.m., Petrov heard some unusual sounds from Angelina, and when she went to check on her, she found Angelina's arms stiff with her legs straight and feet pointing down, completely unresponsive. Petrov splashed water on Angelina's face to try to wake her up and then blew on her face. Petrov explained that despite her efforts Angelina remained unresponsive, so she called for medical attention. Not long after Petrov spoke with Dr. Akbarnia and recounted the events of the last 24 hours, Rodriguez arrived at the hospital and spoke with Dr. Akbarnia.

¶ 9     After speaking to Petrov and Rodriguez, Dr. Akbarnia could not determine the exact timing of when Angelina's injuries occurred but surmised "it definitely was not within a couple of minutes; Angelina's injuries would have been at least three or four hours prior to what defendant is claiming."

¶ 10     Following a CT scan, Angelina was diagnosed with a global anoxic injury, which occurs when there is a lack of oxygen to the brain over an extended period. The CT scan also indicated that Angelina was suffering from cerebral edema or swelling in the brain. Based on those results, Dr. Akbarnia determined that the injuries were not caused by trauma or infection or "any other etiology" but were likely caused by oxygen deprivation. Dr. Akbarnia believed that the injuries were consistent with "somebody placing their hands over someone's mouth and nose several times, for several minutes." Dr. Akbarnia and her team advised that Angelina be transferred to Ann and Robert Lurie Children's Hospital in Chicago (Lurie) because St. Francis Hospital did not have a pediatric intensive care unit (PICU).

¶ 11     Angelina arrived at Lurie around 3 p.m. Shelia Hickey, a social worker at Lurie, met with Petrov while Angelina was being examined. Petrov denied that Angelina experienced any trauma leading up to her admission into the hospital. Petrov told Hickey that Angelina woke up at 7:30 a.m. and was acting normal. Petrov gave her a bottle, changed her diaper, and laid her back down in bed. At 11:30 a.m., Petrov got up and went to check on Angelina. She found Angelina lying in bed "stiff as a board," so she "blew air into her face."

¶ 12     Not long after, Petrov also met with the hospital chaplain at Lurie. Petrov told the chaplain that Angelina had woke up with a "strange look in her eyes" and was "staring off." Petrov picked up Angelina out of bed and put cold water on her face. Angelina proceeded to have a messy bowl movement. Petrov then called for medical attention.

¶ 13    Kalyn Mahoney, a pediatric nurse practitioner at Lurie, met with Petrov at about 3:30 p.m. in order to "get an idea of what brought the child in." Petrov told Mahoney that Angelina seemed healthy and alert at 7 a.m. when she woke up. Petrov fed her and put her back in her crib. Petrov stated that at 11:30 a.m. she found Angelina in her crib "stiff" with her eyes half open, breathing heavily, and red in the face. Petrov said that she put Angelina in the bathtub to try and wake her up, splashed water on her face, and blew on her face. Angelina did not respond and then had a "foul-smelling" bowel movement. Petrov called for medical attention. Petrov denied that Angelina had experienced any head trauma in the hours before she called 911.

¶ 14    Julie Rakay, a social worker at Lurie, testified that Hickey turned the case over to her because she is part of the hospital's protective services team, and she was to perform a child abuse assessment. Rakay learned that Angelina had swelling of her brain and was unresponsive. She interviewed the parents separately. Rakay first interviewed Petrov and during the interview noted that Petrov's demeanor was variable. She appeared blank at times, and at other times she was "laughing and smiling" or "tearful." Petrov indicated that she was not employed and lived in an apartment with her six-year-old son A.P., her two-year-old-son Z.R., and five-month-old-daughter Angelina. Petrov also mentioned that Rodriguez was the father of Z.R. and Angelina, but he did not live with them.

¶ 15    Petrov told Rakay that she was the primary caregiver of Angelina and that her mother would sometimes watch Angelina. Petrov denied any domestic abuse in her relationship with Rodriguez. She reported that Angelina was born two weeks early but was healthy and a "great, happy baby," "who rarely cried." Moments later, Petrov contradicted her earlier statement and said that Angelina "did not laugh and was very serious." Petrov went on to say that Angelina would usually sleep from 11 p.m. to 7 a.m. Angelina had the ability to roll from back to front and

front to back, hold her head up, and push herself up with her hands when lying on her stomach. Yet, again, Petrov contradicted herself and explained that Angelina could not do any of those things and was more like a newborn than a five-month-old.

¶ 16    Petrov then told Rakay that on April 10, 2013, she spent the whole day with Angelina. Angelina woke up at 7:30 a.m., and Petrov fed her and changed her diaper. Soon after, Angelina had a hard poop and took a nap from 12 p.m. until 4 p.m. Angelina went to sleep at 11 p.m. after drinking a bottle. Rodriguez was present on the evening of April 10, but Petrov could not recall if he was there when Angelina went to bed.

¶ 17    The following morning, Petrov woke up and called Rodriguez at 7 a.m. Petrov told Rodriguez that he needed to come to her apartment, as there was an emergency with Angelina. However, later in the interview, Petrov said that Angelina woke up at 7 a.m., was given a bottle, and then put down for a nap. Rakay pressed for clarification. Petrov admitted that she never called Rodriguez on the morning of April 11 and apologized, stating "I am so confused," "I can't think." Petrov clarified that Rodriguez came to her apartment on April 11 around 7:30 a.m. on his own, and they both went back to sleep. Petrov further claimed that she woke up at 11 a.m. and found Angelina "stiff" in her bed. She tried to wake Angelina up, but Angelina would not wake up, so she splashed cold water on Angelina's face and gave her a warm bath. Angelina was still unresponsive and stiff.

¶ 18    Petrov stated that she spent 30 to 45 minutes trying to revive Angelina. She noted that Angelina's pupils were small and that her heart rate was slow. Petrov tried CPR, but Angelina did not respond so she wrapped Angelina in a towel and called 911. During the interview, Petrov denied that Angelina had fallen, been dropped, or had any other trauma that would explain her current condition.

6

¶ 19    After Rakay finished her interview with Petrov, she attempted to interview Rodriguez. Rodriguez "asked if he could have some time" before she interviewed him. She then saw Petrov and Rodriguez interacting. After denying several more requests for interviews, Rodriguez finally agreed to be interviewed at about 9 p.m.

¶ 20    Lisa Genualdi, an acute nurse practitioner in the PICU at Lurie, spoke to Petrov to obtain Angelina's medical and social history to determine how best to treat Angelina. Petrov told Genualdi to "tell Rakay that she is not lying but the baby's daddy will not have the same story as she has." Petrov then told Genualdi that Angelina woke up at 7 a.m. and was fed and burped. She changed Angelina's diaper and put her back to sleep in the playpen on her stomach. At that time, Petrov let her son out the door so her cousin could take him to school. Around 8 a.m., Petrov called Rodriguez to find out what time he was coming home. Rodriguez arrived home around 8:30 a.m. Petrov and Rodriguez went back to sleep, got up around 11:30 a.m., and found Angelina "purple and stiff." They then gave Angelina a bath, splashed water on her face, and took Angelina into her brothers' room to "give her some breaths and some compressions." With no success, Petrov called 911.

¶ 21    Petrov told Genualdi that Angelina lived with her and her two sons A.P. and Z.R. and that Rodriguez did not live with them. Petrov indicated that she was always with Angelina and never left her alone with Rodriguez or anyone else. Petrov stated that she did not work and did not have a babysitter but that her mother helped with the children.

¶ 22    Dr. Emalee Flaherty, chief of the division of child abuse pediatrics at Lurie, and the medical director of the multidisciplinary pediatric education and evaluation consortium, testified as an expert in the field of medicine and child abuse. After Angelina was transferred to the Lurie PICU, she was treated by Dr. Kelly Liker, a fellow in child abuse pediatrics who Dr. Flaherty

supervised.

¶ 23     Dr. Flaherty personally examined Angelina. Dr. Flaherty also reviewed the medical

records from St. Francis and Lurie, including lab tests and radiology reports; paramedic reports;

reports from two primary care physicians; Department of Children and Family Services (DCFS)

notes; and the medical examiner's report. She also spoke with Dr. Liker, who had interviewed

Petrov and Rodriguez and spoke with Angelina's primary care physician. Dr. Flaherty also spoke

with the social workers who interviewed Petrov.

¶ 24     Dr. Flaherty testified that Angelina was transferred to Lurie and treated in the PICU

because she was in "severe neurological distress." In the PICU, Angelina was unresponsive, her

pupils were constricted, and she was on a ventilator that was breathing for her. She had no

visible signs of injuries.

¶ 25     CT scans showed that Angelina had severe, global, hypoxic ischemic brain injuries and

cerebral edema. Because of the swelling, the ridges of her brain had disappeared, the ventricles

of her brain were barely visible, and the two halves of her brain were squeezed closely together.

Her brain had begun to herniate down her spinal cord. These injuries could only be caused by

lack of oxygen to the body. Continuous testing revealed that Angelina had no brain activity and

that she was only being supported by machines. She was pronounced brain dead after she was

found to have lost corneal, gag, and cough reflexes. She was pronounced dead on April 15, 2013,

at 1:36 p.m.

¶ 26     Dr. Flaherty opined that Angelina's injuries were the result of child abuse. Neither of

Angelina's parents reported or offered any illness or injury that would account for Angelina's

condition. Dr. Flaherty also opined that Angelina was medically neglected due to the "significant

delay in seeking care" after she was found unresponsive at 11 a.m. A later report that a hand was

placed over her mouth and nose several times for up to several minutes at 3 a.m. would explain the "terrible injuries that Angelina suffered."

¶ 27    Dr. Flaherty further opined that based on her injuries, Angelina would not have been fine at 7 a.m. on April 11 because she suffered significant oxygen deprivation. Dr. Flaherty stated that, "[s]he might not have been as impaired as when she was presented to St. Francis, but she would not have been normal." Dr. Flaherty stated that she could not determine the exact time that Angelina had been deprived of oxygen. She confirmed that "smothering would certainly cause these injuries," but they could also be caused by drowning, of which there was no evidence in this case.

¶ 28    Cook County deputy medical examiner Lauren Woertz testified as an expert in the field of forensic pathology. Dr. Woertz conducted Angelina's autopsy and found no external injuries. Angelina's internal examination showed cerebral edema, anoxic encephalopathy, and asphyxiation secondary to suffocation. In her expert opinion, Dr. Woertz determined that the cause of death was asphyxiation due to suffocation and the manner of death was homicide.

¶ 29    Chicago police detective Mary Nanninga testified that she spoke with Petrov in the Lurie PICU on April 12, 2013, at 12:40 a.m., while Detective Michael Kennedy spoke separately to Rodriguez. Petrov told Detective Nanninga that at 9 p.m. on April 10, 2013, she put Angelina to sleep on her stomach for the first time, with her head on a pillow. At 7 a.m., on April 11, 2013, Petrov woke up and helped A.P. off to school. Angelina woke up at 7:30 a.m. and Petrov fed Angelina a bottle, burped her, changed her diaper, and put her back down for a nap. Petrov indicated that Angelina seemed healthy with no signs of breathing problems. Petrov returned to bed, and Rodriguez arrived shortly thereafter. Petrov woke up at 11 a.m. and found Angelina wheezing with her arms stiff, eyes half open, and face red. Petrov yelled to Rodriguez "that

9

something was wrong." Petrov tried to revive the baby in the bathtub and splashed cold water on Angelina's face, but she remained unresponsive. Petrov removed Angelina from the bathtub and wrapped a towel around her. Soon after, Angelina had a bowel movement on the floor. Petrov cleaned up and moved Angelina to the living room where she placed Angelina on the twin bed, and Rodriguez blew air into Angelina's mouth. Angelina remained unresponsive, so Petrov called 911.

¶ 30    Detective Nanninga ended her conversation with Petrov and went to speak with Detectives Kennedy and Diaz. Detectives Kennedy and Diaz had previously spoken with Angelina's doctors, and they informed Detective Nanninga that Angelina had severe brain swelling due to a lack of oxygen. Petrov, accompanied by detectives, then proceeded to Petrov's apartment. When they arrived at 2:10 a.m. on April 12, 2013, Detective Nanninga noted that she saw two "makeshift" beds on the floor of the living room, and the "pack 'n play" in the only bedroom of the apartment. The pack 'n play had numerous neatly folded blankets in it with baby products in the pockets. Detective Nanninga did not see any alcohol in the apartment.

¶ 31    At 1:30 p.m. on April 12, 2013, Detectives Nanninga and Kennedy spoke with Dr. Liker and learned that Angelina's injuries were not the result of an accident. Thereafter, Petrov and Rodriguez were placed under arrest for aggravated battery and were transported from the hospital to the police station. From 4:30 to 5:05 p.m., Detectives Nanninga and Kennedy spoke to Petrov in an interview room. After she was Mirandized (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), Petrov agreed to speak with them. At 5:15 p.m., Detectives Nanninga and Kennedy spoke with Rodriguez in a separate interview room. Detective Nanninga testified that later that evening, Petrov's father and brother arrived at the police station and spoke with Detective Kennedy. Petrov's father and brother told Detective Kennedy that Petrov had been lying about

10

the cause of Angelina's death.

¶ 32     Detectives Nanninga and Kennedy confronted Petrov, and she admitted that she had been lying. Petrov stated that Rodriguez had been living at the Fitch Avenue apartment with her and the children since November 2012. After the children fell asleep on the night of April 10, she and Rodriguez drank a fifth of Hennessy mixed with Red Bull while listening to music in their bedroom. Angelina woke up at 3 a.m., crying. Petrov fed her a bottle and changed her diaper. Angelina continued to cry. Rodriguez became frustrated and grabbed Angelina from Petrov, who was rocking her. Rodriguez placed Angelina in her bed and placed his hand over Angelina's nose and mouth for approximately one minute until she stopped crying. Petrov tried to stop Rodriguez and attempted to grab Angelina back but was unsuccessful.

¶ 33     After Rodriguez removed his hand from Angelina's mouth and nose, she began gasping for air and started crying again. Rodriguez placed his hand over Angelina's mouth and nose for another minute and released his grasp. Angelina began crying again. Rodriguez placed his hand over her mouth and nose a third time for approximately a minute. Angelina became limp and unresponsive and remained unresponsive. Rodriguez placed her back in the pack 'n play so he and Petrov could have sexual intercourse.

¶ 34     After having sex, Petrov and Rodriguez went to sleep. The next morning, at 7 a.m., Petrov woke up to get A.P. dressed for school. After A.P. left for school, she went back to bed. At 11 a.m., she woke up because Rodriguez was talking on the phone. Petrov got out of bed and went to shower. When she walked back into the bedroom, she saw Angelina wheezing. She picked Angelina up and found her arms stiff and her face red. She was completely unresponsive. Petrov called for Rodriguez who placed Angelina in warm water and threw cold water on her face. Petrov then wrapped Angelina in a towel, but Angelina started having a bowel movement.

Petrov brought Angelina into the living room, and Rodriguez began blowing on Angelina's face. Petrov called 911.

¶ 35    Petrov revealed that she and Rodriguez spoke before they called 911 and agreed to tell authorities that Rodriguez did not live at the apartment and that he was not present on the night of the accident. They agreed that Petrov would tell the police that she laid Angelina on her stomach, so the police would believe that Angelina just suffocated. Petrov told Detective Nanninga that she and Rodriguez concocted this story because she loved Rodriguez and did not want him to go to jail and because she was a terrible person for not stopping him.

¶ 36    Not long after Petrov's confession to Detectives Nanninga and Kennedy, Assistant State's Attorney Susanne Groebner was contacted and arrived at the police station shortly thereafter. Groebner and Detective Nanninga spoke to Petrov again at 12:45 a.m. on April 13, 2013, and Petrov repeated the same account she gave Detectives Nanninga and Kennedy. At 3:15 a.m., Petrov gave a videotaped statement that was played in open court.

¶ 37    In the videotaped statement, Petrov admitted that on April 10, 2013, she and Rodriguez put the kids to bed at 9 p.m. At 10:30 p.m., she and Rodriguez started drinking Hennessey, Red Bull, and Sprite. Angelina woke up crying at 3 a.m., and she picked her up and gave her a bottle. She also changed Angelina's diaper and placed her back in the pack 'n play. As soon as she was placed in the pack 'n play, Angelina started crying again. Petrov picked Angelina back up and began rocking her. Rodriguez grabbed Angelina out of her arms and placed her back in the pack 'n play. Rodriguez then placed his hand over Angelina's mouth for about a minute. Petrov tried to move Rodriguez's hand away from Angelina's mouth but was unsuccessful. When Rodriguez removed his hand from Angelina's mouth, Angelina took a big gasp for air. Petrov tried picking Angelina up, but Rodriguez pushed her away and placed his hand back on Angelina's mouth.

Petrov asked Rodriguez to stop. Rodriguez pushed Petrov away, and she nearly hit the back wall of the bedroom.

¶ 38      Petrov then sat on the bed while Rodriguez's hand was on Angelina's face. When Rodriguez finally took his hand off Angelina's face, Petrov did not try to grab Angelina because she was scared and "didn't want Rodriguez to try to hit her or anything." Angelina took another big gasp for air and began crying again. Rodriguez placed his hand over Angelina's face for a third time, while Petrov sat and watched. After nearly a minute, Rodriguez removed his hand from Angelina's mouth and then Angelina took another breath and fell asleep.

¶ 39      Petrov stated that she woke up the next morning at 7 a.m. to get her son off to school. She checked on Angelina by moving her a "little bit to the side and saw she was breathing and went back to sleep." She was awoken at 11 a.m. to Rodriguez talking on the phone. Rodriguez ordered that she get up and take a shower. Petrov got into the shower, and Rodriguez joined her. After showering, Petrov returned to the bedroom and noticed that Angelina was wheezing. Petrov told Rodriguez that something was wrong with Angelina. Petrov put Angelina in a warm bath and poured cold water over her face to try and wake her up. Angelina was not responding. As Petrov dried her off with a towel, Angelina "pooped on the towel and on the floor." Petrov then placed Angelina on the bed, while Rodriguez blew into her mouth and pumped her chest. Petrov noted that Angelina's pupils were very small, and she had a very slow heartbeat. Angelina remained unresponsive, so Petrov called 911. Petrov admitted that she never told the emergency medical technicians or hospital personnel that Rodriguez put his hand over Angelina's face. Petrov stated that she was "a terrible person for not telling the truth."

¶ 40      Petrov testified at trial. On April 10, 2013, at about 3:30 p.m., she was home with two of her children when Rodriguez brought A.P. home from school. They had dinner, and the children

were put to bed at 9 p.m. At 10:30 p.m., she and Rodriguez started drinking Hennessy mixed with Red Bull and Sprite. They were listening to loud music on the TV. At 3 a.m., Petrov and Rodriguez were about to have sex, but Angelina started crying. Petrov changed her diaper and fed her a bottle, but Angelina kept crying. Rodriguez began getting angry. He wanted to have sex, but Angelina kept crying. Petrov began rocking Angelina and walked into the other room to avoid further angering Rodriguez. Angelina continued to cry.

¶ 41    Rodriguez followed Petrov into the other room and grabbed Angelina from Petrov and placed his hand over Angelina's mouth. Rodriguez smothered Angelina's nostrils for nearly a minute. Petrov testified that she tried to stop Rodriguez by grabbing at Angelina and telling him to "stop doing that to her." Petrov was afraid that "something bad was going to happen to [Angelina]." Rodriguez did not listen. Petrov tried to pull Angelina's right leg and left arm but was unsuccessful.

¶ 42    While Rodriguez's hand was covering Angelina's mouth, Angelina continued to struggle for air, moving her arms "real fast." Rodriguez finally let go, and Angelina gasped for air and began crying again. Rodriguez again placed his hand over her mouth and nose. Petrov testified that "she tried to stop it." She felt threatened, as Rodriguez had been "abusive towards her for a long time." Petrov tried to physically stop Rodriguez again, but Rodriguez pushed Petrov and hit her in the "same spot" where he had hit her "a couple days ago." Petrov stated that she "sort of dosed [*sic*] off" and then sat down on the bed next to Rodriguez. Rodriguez took his hand off Angelina's mouth, and Angelina continued to cry. Rodriguez proceeded to put his hand back over Angelina's mouth and nose for the third time for about 30 seconds. Angelina was gasping, and her body finally went limp. Petrov stated that she was trying to tell Rodriguez to stop while sitting on the corner of the bed. Petrov claimed that she wanted to grab Angelina, but Rodriguez

was extremely strong, so she did not try.

¶ 43     Petrov explained that she wanted "to see what was wrong with the baby," but Rodriguez "forced" her to have sex with him. After having sex, Petrov and Rodriguez fell asleep. Petrov never tried to leave the house, nor did she seek help for Angelina while Rodriguez was sleeping. Petrov testified that she woke up at 7 a.m. to get A.P. off to school. After A.P. left for school, Petrov went back to bed. When asked if she checked on Angelina, Petrov answered, "yes," but could not answer how Angelina was doing. Petrov claimed that she had told Rodriguez to check on Angelina, and he said, "Angelina was okay."

¶ 44     Petrov then testified that Rodriguez woke her up at 11 a.m. by jumping on the bed. Petrov told him that she had a bad dream, but Rodriguez did not seem to care. Rodriguez was talking to Petrov's cousin on the phone, calling Petrov lazy. Petrov again tried to tell Rodriguez that she had a bad dream, but he responded that he "didn't give a f***." Petrov proceeded to take a shower with Rodriguez. After showering, Petrov noticed that Angelina "was still face down," and would not usually be "sleeping that long." Petrov picked Angelina up and noticed that she was "very stiff." Petrov took Angelina to the bathroom and put her in warm water and put cold water on her face. Angelina did not respond and remained stiff, so Petrov brought her to the living room and called 911.

¶ 45     Petrov rode in the ambulance to the hospital. Upon arrival, hospital personnel inquired about Petrov's own face, as she had a blood clot in her eye. When further prompted, Petrov testified that they also asked about Angelina. Petrov admitted she told them a "different story" and testified that Rodriguez told her what to say. Petrov stated that she stuck to the story Rodriguez gave her because she was "in fear for her life." Petrov said that Rodriguez had hit her and assaulted her for 5½ years.

¶ 46    Petrov testified that Rodriguez "was very abusive" and had abused her in front of the children. Further, Rodriguez kicked A.P. and broke A.P.'s collar bone because A.P. refused to brush his teeth. Petrov explained that she and Rodriguez concocted a different story about how A.P. got hurt to tell DCFS and the police. She stated that their lying worked because DCFS did not pursue child abuse allegations against Petrov or Rodriguez. Yet, Petrov continued to allow Rodriguez to live in the home after he broke A.P.'s collarbone. Petrov admitted that she and Rodriguez again concocted a story and lied to authorities about what happened to Angelina. Rodriguez's mother went to the apartment before the detectives arrived to dispose of the evidence of their drinking. Petrov said she lied because she did not want her kids taken away and was scared of Rodriguez. Petrov admitted that she saw Rodriguez repeatedly put his hand over Angelina's face, knowing that "it was dangerous."

¶ 47    The trial court found Petrov guilty of first degree murder. The trial court found Petrov's testimony to be "absolutely unbelievable." Petrov "did nothing" to intervene to help Angelina, and Petrov was "completely about self-preservation in not protecting her five-month-old that could not defend herself." The court also found that as soon as Petrov realized that she and Rodriguez could no longer keep their story straight, Petrov began distancing herself from Rodriguez to create a defense for herself. The court noted that Petrov admitted that she knew that Rodriguez could be violent with the children and that Petrov had many opportunities to report the abuse to the authorities but chose to do nothing. Petrov was then sentenced to 75 years' imprisonment.

¶ 48    Petrov, through newly retained counsel, filed a motion for a new trial. In this motion, Petrov's new counsel argued that Petrov's trial counsel failed to introduce key evidence at trial that would have corroborated Petrov's testimony that she was a longtime victim of Rodriguez's

16

violent behavior. Petrov argued that this evidence negated the required *mens rea* element of first degree murder. Counsel sought to introduce a police report and police photographs of Petrov following her arrest in this case, Petrov's medical records from June 2012, July 2011, and June 2011, and Petrov's dental records from 2010, all of which Petrov alleged showed that Rodriguez was physically abusive to her. The report prepared by a Chicago Police Department evidence technician after Petrov was arrested states that Petrov had "bruising and swelling around both eyes," "laceration above left eyebrow," and "visible mark to right side of chin." In addition, the evidence technician took a picture of Petrov that showed her injuries, which Petrov alleged were caused by Rodriguez striking her in the head two days before Rodriguez deprived Angelina of oxygen. The June 2012 medical record states that Petrov had a "left forehead laceration" that required four sutures, which Petrov alleged was caused by Rodriguez punching her in the face when she was five months pregnant with Angelina; the July 2012 medical record states that she had "left foot fracture," which Petrov alleges was caused by Rodriguez grabbing and twisting her body, causing her to fall to the floor; and the June 2011 medical record states that she sustained injuries to numerous parts of her body, including the left side of her ribs, abdomen, and right eye, which Petrov alleges was caused by Rodriguez kicking her. The March 2010 dental record states that Petrov suffered "traumatic injury" of "broke[n] and fracture[d] teeth," which Petrov alleges was caused by Rodriguez punching her in the face. In response, the State argued that Petrov's trial counsel was effective for recognizing that there was no such thing as a "denial through a battered women's defense." In addition, the State argued that the fact that Petrov was previously abused did not mean that she could not be held accountable for Angelina's murder. The State further argued that Petrov had a legal duty to act on behalf of her own children and, because she failed to protect her children and allowed Rodriguez to abuse their child, Petrov shared

Rodriguez's criminal intent and is liable for Angelina's death.

¶ 49    Denying Petrov's motion for new trial, the judge reasoned, "just because a relationship might be volatile and even physical, that does not negate an individual's responsibility in a case. All the evidence contradicted any indication of defendant's psychological or mental means being in some way negated or interfered with by Rodriguez's prior abuse." The trial judge also stated that new evidence that Petrov sought to introduce would not have justified Petrov's failure to intervene to protect Angelina. Petrov's motion to reconsider was also denied. Petrov now appeals.

¶ 50                          ANALYSIS

¶ 51    Petrov argues that she was denied due process where the trial judge relied on her private knowledge about the nature and dynamics of domestic violence to reject her testimony that, based on Rodriguez's history of domestic violence against her, she feared he would harm or even kill her if she made further efforts to intervene to protect Angelina and did not lie to medical treaters and police to protect Rodriguez. Because we agree that Petrov was denied due process and that the trial court's error was not harmless, it is not necessary for us to address Petrov's argument that her trial counsel was ineffective because he failed to offer into evidence Petrov's medical and dental records and police photographs as proof of the injuries she allegedly sustained as a result of Rodriguez's physical abuse. However, in addressing whether a retrial would violate the double jeopardy bar, we must necessarily address Petrov's argument that the trial court relied on a defective formulation of the elements of accountability by relieving the State of its burden to prove the required *mens rea*.

¶ 52    We begin with Petrov's due process argument. From our review of the record, we note that in finding Petrov guilty, the court found that Petrov had numerous opportunities where she

was alone with medical personnel and investigators and could have told someone what Rodriguez had done to Angelina but did not. The court then addressed Petrov's defense that her failure to do more to protect Angelina was driven by her fear that Rodriguez would batter her if she did, which we quote at length:

"At no time do you indicate anything in regards to him doing this or announcing this. Your abuser torment [*sic*] her, person in control is not near you. You have the opportunity to inform everybody of exactly what's going on. Now, I know that the cycle of domestic violence is one that has been very studied, and it's not a novel or a new theory in regards to negating an individual's responsibility or act or conduct in a certain situation.

There is nothing new or novel about this, and the Court is quite familiar with the signs of the domestic cycle meaning that initially the abuser gain [sic] psychological control of the victim that they control their every move, and then it escalates to a situation of physical domestic abuse, and then there's the honeymoon phase.

And this continues on and on, but what the Court note [*sic*] is your very own testimony beguiles that attempted defense she attempted to interject. From the moment that you talk about your relationship you indicated it's on and off. An on-and-off domestic relationship does not occur.

If a person is an abuser they have over that individual, and they maintain control. I will note at one point I found in the transcripts that you indicate that you didn't want to have sex and you had it, but on Cross-Examination you indicated you as well were at that point preparing to engage in sexual intercourse with Mr. Rodriguez. That after that's done that you lay there that you want to get up and check on the baby, but you don't that

you then get up at seven and then you changed that to 11.

And you wanted to check on the baby and you didn't and you fell asleep that you indicate that you got up in the morning at one point and showered yourself, and you indicated he followed you. That you showered, [h]e's there, you're both showering together that you get out and you're drying off and at the same time you realize that the two year old is showered and in a diaper, which the two year old I don't know how that child reached the shower or was showering by themself. Maybe you left it on, but at any rate, the two-year old is showering by themself and is now outside of the shower and in a wet diaper.

At that point, you indicate to me that you tell Rodrigo Rodriguez to check on the child. You've attempted to indicate all of these events that something had even happened two days prior. What your version of events or the statements that you gave to the Court are nowhere even consistent with an individual that is in a domestic violent relationship.

There is no way that a victim tells you the abuser what to do whereas you went to tell him to go check on that child. That is not how a typical or any abusive relationship occurs. One is in control, one is controlled. There's no way the controlled is telling the controller what to do.

* * *

And the reason that I asked this was because as a parent you have a duty and an obligation to protect a child. It is a parent's responsibility. Even in a domestic violence relationship the abused will sacrifice themselves for the child."

The trial court then went on to explain to Petrov each of the ways in which her testimony lacked consistency and credibility. The court stated that Petrov's "testimony [was] absolutely

unbelievable" and that Petrov was "completely about self-preservation."

¶ 53    In denying Petrov's motion for new trial, the trial court again explained why she rejected Petrov's testimony that the reason she did not do more to protect Angelina and lied to medical treaters and police to protect Rodriguez was because she feared for her own safety given Rodriguez's long history of domestic violence against her:

> "One of the things that has left an impression on the Court—because let me just say this let me get this forth—I have studied and lectured on domestic violence and the cycle of domestic violence in my prior practice, and I have a full comprehension of the cycle of violence and what domestic violence victims endure. So that I understand the one person is in control. The other person is manipulated, be it emotionally, physically and in various ways. There is a cycle of the honeymoon phase. There is a stage of where the incident occurs. Well, the first stage is where they start out, and it's a very happy relationship, to a stage where it gets intense and there's manipulation. There is an event that occurs and that abuser then—it's called the honeymoon phase—does everything in his way to try and appease that abused. What is important to note, and again, in regards to the issue of control or fear or the issue of domestic violence coming in, again, not to negate responsibility, but to understand an individual's mind set, psychologically where they are at, an abuser is constantly in control, constantly. There's never a various where the alleged victim, where it changes hands. And what struck me so much in this case was two events. The event after the baby is found that morning, and she tells him, this is from Ms. Petrov's mouth, she says to him, 'You go call 911.' And secondly was the events in which, at the hospital he needs to talk to her so they can get their stories straight. If he is in control and he is the abuser, that's not how it's going to work. He is going to inform

everybody how it's going to happen. To say that this is, while it is a volatile and

unhealthy relationship, but to suggest that there is such abuse against Ms. Petrov to

somehow put forth again, not a defense, but saying her mind set and what she was able to

appreciate and the current environment that was going on to explain her conduct or to

indicate conduct and why that occurred on that day, it doesn't exist here. It does not exist

in any way, shape or form."

Elaborating further, the trial court stated:

"I heard from [Petrov]. She told me about the abuse, I got a chance to see it. But she also,

what she didn't understand was the Court understood the nuances extremely well, in

teaching on the subject and practicing in this area of what domestic violence consists of

and how People react and how People conduct themselves due to psychological and

physical manipulation and who is in control and who is not. And all the evidence

contradicts any indication of her being in some way under the influence or under some

way her psychological or mental means were some way negated or interfered with by the

fact of Mr. Rodriguez's prior abuse."

¶ 54    In a bench trial, it is the function of the trial court to determine the credibility of

witnesses, weigh the evidence, draw reasonable inferences therefrom, and resolve any conflicts

in the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). The trial court is "free to

accept or reject as much or as little as it pleases of a witness' testimony" (*People v. Nelson*, 246

Ill. App. 3d 824, 830 (1993)) and "may take into account her own life and experience in ruling

on the evidence" (*People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007)). However, in a bench

trial, the judge is limited to the record developed during the course of the trial before her. *People

v. Wallenberg*, 24 Ill. 2d 350, 354 (1962). "A determination made by the trial judge based upon a

22

private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law." *Id.*

¶ 55    We need only reverse a court's determination when the trial court's reliance on matters outside the record is prejudicial to one of the parties. *People v. Banks*, 102 Ill. App. 3d 877, 882 (1981). However, "[r]eliance on information found [outside] the record is not reversible error where there is no evidence that it either misled or entered into the trial court's determination." *Id.* We afford a trial court every presumption that it considered only admissible evidence in reaching a conclusion. *Wallenberg*, 24 Ill. 2d at 354. "This assumption will be overcome only if the record affirmatively demonstrates the contrary, as where it is established that the court's finding rests on a private investigation of the evidence, or on other private knowledge about the facts in the case." *People v. Tye*, 141 Ill. 2d 1, 26 (1990). The issue of whether the defendant was denied due process by the trial court's reliance on information outside the record is reviewed *de novo*. *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001).

¶ 56    In *Wallenberg*, the defendant testified his truck had a flat tire as he traveled down a certain road, and he was unable to find a gas station. *Wallenberg*, 24 Ill. 2d at 352-53. The trial court, in declaring its judgment, remarked that, although the defendant stated that he found no gas stations along that stretch of the road, " 'I happen to know different. I don't believe his story.' " *Id.* at 354. However, no evidence contradicting the defendant's testimony was in the record. *Id.* Our supreme court found the trial court improperly decided based upon its private knowledge instead of the evidence in the record before it and therefore, the presumption that the trial court considered only admissible evidence was rebutted. *Id.*

¶ 57    Likewise, in *People v. White*, 183 Ill. App. 3d 838, 839 (1989), at a hearing on the State's petition to revoke the defendant's probation for allegedly committing an aggravated battery, the

victim alleged that the defendant cut him, and the defendant testified the victim fell on a bottle. The court, based on its personal examination of the victim's wound, found that the location and pattern of the wound indicated that it had been inflicted by a knife rather than by a bottle. *Id.* at 840. We found that the trial judge's examination of the cut and determination that the instrument that inflicted the cut was not a bottle was not within the province of common knowledge, and the parties could only introduce this type of evidence through a qualified expert. *Id.* at 841. After plain error analysis, we reversed the trial court's decision because there was no expert testimony presented on the matter, and therefore the trial court erred in considering facts not in evidence. *Id.*

¶ 58    Similarly in *People v. Jackson*, 409 Ill. App. 3d 631 (2011), the defendant raised a defense of insanity at his bench trial for first degree murder. During the trial, the judge stated that he knew the medications the defendant received were not evidence of mental illness but were " 'given proactively for people in incarcerated circumstances,' " even though there was no evidence presented to support the court's statement. *Id.* at 637, 650. The judge also stated that intelligence quotient (IQ) testing was a " 'total canard. I don't see the relevance of IQ in this case,' " despite the defense's expert witness's testimony that the difference between the defendant's verbal and performance IQ scores was significant evidence of mental disease. *Id.* at 643, 645, 650. We reversed the defendant's conviction, finding the trial judge relied on his own private knowledge that was untested by cross-examination. *Id.* at 650.

¶ 59    We acknowledge that this case differs from *Wallenburg*, *White*, and *Jackson* in that the trial judge here had amassed a considerable wealth of knowledge on domestic violence over the span of her legal career. We are not ignorant of the fact that the trial judge could not completely disregard her knowledge of domestic violence in order to hear this case, nor would we expect her

to. However, as in *Wallenburg*, *White*, and *Jackson*, the trial court improperly used her personal knowledge, in this case regarding the nature and cycle of domestic violence, which was not based on any evidence in the record, to assess Petrov's credibility and to discredit her testimony that she failed to intervene to protect Angelina and lied to protect Rodriguez because she was in fear for her own safety. See *Banks*, 102 Ill. App. 3d at 882-83 ("a denial of due process results only where the trial court has used the [private] information to contradict important evidence offered by the defendant").

¶ 60    Here, Petrov testified that she was the victim of Rodriguez's physical abuse for "five and a half years." She testified that the first time Rodriguez put his hand over Angelina's mouth, she told him to "stop doing that to her" and then tried to "grab" Angelina away from Rodriguez by pulling on her "right leg and her left arm." She "tried to stop it but [she] was too afraid and scared." The second time Rodriguez put his hand over Angelina's face, Petrov "tried to go by her, but he pushed [her]" against the wall and hit her on the head, testifying that she "already had, like, an incident 2 days before prior. I had two black eyes and a broken nose, and he hit me in the same spot, and I kind of dazed out, and I went onto the bed, and I sat down." Petrov testified that when Rodriguez covered Angelina's mouth and nose the third time, she was "crying, sitting on the corner of the bed, and telling him to stop; and I—I wanted to grab her, but he was extremely strong." Petrov further testified that Rodriguez told her not to tell medical treaters and other hospital personnel or the police what happened to Angelina and that she complied because Rodriguez put her "in fear for [her] life", and that she was "very afraid" of and "felt threatened" by Rodriguez.

¶ 61    The court commented that Petrov's relationship with Rodriguez, as Petrov described during her testimony, was not typical of a domestic violence relationship as it did not conform to

25

the typical cycle of violence. Further, the court found that Petrov did not behave as a typical victim of domestic abuse, noting, for example, that a domestic violence victim does not tell an abuser what to do. Neither the State nor the defense presented an expert witness on domestic violence, the nature and cycle of domestic violence, or battered women's syndrome. The only real evidence on the inner workings of domestic violence came in the form of the trial court's comments, which were based on her own personal knowledge and experience as a lawyer, teacher, and judge. These comments regarding the nature and cycle of violence, and the typical, expected behavior of the victim and the abuser, knowledge that the court openly used to assess Petrov's testimony, went above and beyond what we consider to be within the province of common knowledge and normal life experience. Rather, this type of evidence could only be introduced through a qualified expert witness. *Cf. People v. Jenk*, 2016 IL App (1st) 143177, ¶¶ 48-50, 55 (comments by trial judge regarding domestic battery victim's decision to remain with abuser and her credibility were "benign" and did not form the basis of the court's ultimate ruling); *People v. Christensen*, 2021 IL App (1st) 192579-U, ¶¶ 56-59 (the trial court did not improperly rely on its personal experience as a public-school student of, among other things, playground fights and self-defense, but rather, engaged in its duty of weighing the evidence, making inferences from the evidence, and determining the credibility of the witnesses); *People v. Williams*, 2021 IL App (5th) 190251-U, ¶¶ 44, 46 (finding no error where trial judge relied upon his own personal preexisting and general knowledge of working farms and did not conduct a private investigation of the evidence or rely upon private knowledge of the facts of the case); Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (permitting citation of nonprecedential orders entered on or after January 1, 2021, for persuasive purposes). Therefore, we find the trial judge's comments regarding her knowledge of domestic violence and the use of that knowledge to assess Petrov's

credibility and discredit her testimony that Rodriguez made her fear for her life and safety rebuts the presumption that she considered only competent evidence. As a result, Petrov's due process rights were violated, and Petrov is entitled to a new trial before a different judge. See *Dameron*, 196 Ill. 2d at 179 (because trial judge's actions were improper, the cause was ordered to be heard before a different judge on remand "in order to remove any suggestion of unfairness").

¶ 62     The State, however, contends that any error by the trial court in relying on its private knowledge and experience was harmless because Petrov's testimony about Rodriguez's history of physical violence against her was collateral to the issues in the case. Specifically, the State argues that Rodriguez's physical abuse of Petrov "was not relevant to the issues in the case which were: whether she had a legal duty to protect Angelina from harm, and whether she had knowledge that [Rodriguez's] act created a substantial risk of death or great bodily harm to Angelina such that [Petrov's] failure to act to protect Angelina 'aided' or 'sanctioned' [Rodriguez's] acts" for purposes of the State's accountability theory. We disagree.

¶ 63     Petrov had a clear duty to protect Angelina. *People v. Stanciel*, 153 Ill. 2d 218, 236 (1992) (duty of parent to protect young child recognized over a century ago). "Criminal conduct may arise not only by overt acts, but by an omission to act where there is a legal duty to do so." *Id.* However, Petrov was not required to put herself in danger of death or great bodily harm to save Angelina's life. See *id.* (citing Wayne R. LaFave & Austin W. Scott Jr., Handbook on Criminal Law § 26, at 182 (1972) ("a person may be criminally liable when his omission to act produces that result, but only if (1) he has, under the circumstances, a legal duty to act, and (2) he can physically perform the act")). In making her ruling, the trial judge stated that "[e]ven in a domestic violence relationship the abused will sacrifice themselves for the child" and that the "basic instinct of any parent *** is to protect their offspring to sacrifice themselves for their

offspring for their child." Although Illinois courts have not directly addressed the lengths to which a parent must go to protect their child from abuse, we find some guidance from the North Carolina state supreme court's decision in *State v. Walden*, 293 S.E.2d 780 (N.C. 1982).

¶ 64    In *Walden*, the mother was convicted of aiding and abetting because she failed to take reasonable steps to prevent the deadly assault on her child. *Id.* at 782. The *Walden* court adopted the approach later taken by our supreme court in *Stanciel*, but further clarified the scope of a parent's duty. The court stated,

> "This is not to say that parents have the legal duty to place themselves in danger of death or great bodily harm in coming to the aid of their children. To require such, would require every parent to exhibit courage and heroism which, although commendable in the extreme, cannot realistically be expected or required of all people. But parents do have the duty to take every step reasonably possible under the circumstances of a given situation to prevent harm to their children." *Id.* at 786.

Clearly, the issue of Petrov's legal duty to protect Angelina from harm was central to this case. Petrov's testimony of abuse was similarly central to the case to the extent that the alleged abuse by Rodriguez explained her failure to provide the necessary aid to Angelina.

¶ 65    In addition, and contrary to the State's argument, the abuse that Petrov claimed to suffer at the hands of Rodriguez was not collateral to the issue of whether Petrov's "failure to act to protect Angelina 'aided' or 'sanctioned' [Rodriguez's] acts" for purposes of the State's accountability theory. Here, it is conceivable that a reasonable fact finder on retrial could find Petrov not liable for Angelina's murder under the common design theory of accountability because, based on Rodriguez's alleged past history of physical violence against Petrov, Petrov reasonably feared that Rodriguez would take her life or do her great bodily harm if she made

further efforts to intervene to protect Angelina or did not conceal Rodriguez's criminal acts from medical treaters and the police.

¶ 66    Petrov testified that she was physically abused by Rodriguez for 5½ years. She testified that, just two days before Rodriguez suffocated Angelina, Rodriguez punched her in the head, leaving her with a broken nose and two black eyes. In her motion for new trial, she offered police, medical, and dental records of her injuries to support her argument on appeal that she received ineffective assistance of trial counsel. These records do not identify Rodriguez as her assailant, but we recognize that victims of domestic violence often lie to police and medical treaters to protect their abusers, just as Petrov testified that she did here after Rodriguez repeatedly deprived Angelina of oxygen, and after Rodriguez kicked A.P. and broke his collar bone. *Cf. Jenk*, 2016 IL App (1st) 143177, ¶¶ 5, 48-50 (rejecting challenge to sufficiency of evidence against defendant where domestic battery victim, who loved defendant despite defendant having previously battered her on several occasions, falsely told hospital personnel and police that she was " 'jumped' " by an unknown assailant in order to protect defendant). See also *People v. Ward*, 2021 IL App (2d) 190243, ¶ 94 (Zenoff, J., concurring in part and dissenting in part) ("victims of domestic violence often feel a sense of loyalty to their abusers, [so] they may protect the abusive family member by denying, minimizing, or recanting their earlier reports of domestic violence"); *People v. Appelt*, 2013 IL App (4th) 120394, ¶ 66 ("[V]ictims of domestic violence can be very forgiving. After their bruises heal and some time passes, they commonly change their mind about testifying against the loved one who beat them up.").

¶ 67    We are keenly aware that Petrov gave multiple versions of the events leading up to Angelina's death, and her testimony at trial conflicted with what she told medical providers and

police. However, Petrov's testimony, if deemed credible on retrial, may be found to be at odds with a common design theory of accountability and therefore cannot be considered collateral to the issues in this case as the State suggests. For example, when Angelina woke up crying at 3 a.m., Petrov fed her, changed her diaper, and tried to comfort her, belying any suggestion that she aided Rodriguez in the planning or commission of Angelina's murder. In addition, Petrov testified that she repeatedly told Rodriguez to stop smothering Angelina and that she attempted to physically take Angelina from Rodriguez twice. Petrov testified that the second time she tried, Rodriguez hit her on her head in the same spot that he did two days earlier, and that incident two days earlier left her with a broken nose and two black eyes. Rodriguez also threw Petrov toward the bedroom wall, and she "kind of dazed out." This evidence could potentially belie the notion that Petrov provided aid to Rodriguez in the commission of the acts that resulted in Angelina's murder such that she is accountable for her death. Petrov also testified that she did not make any further efforts to intervene to protect Angelina because she feared for her own safety if she did. This testimony, if credited by the fact finder, could undermine the notion that Petrov was engaged in a common design to murder Angelina. Rodriguez's history of physical abuse against Petrov, and Petrov's fear that Rodriguez would physically batter her if she tried to further intervene, if deemed credible, could explain and legally justify why she failed to do more to protect Angelina.

¶ 68    We conclude that such evidence, if credible, could undermine the State's theory that Petrov aided Rodriguez through a common design because her failure to act was motivated not by her desire to aid Rodriguez in murdering Angelina but by her desire to protect herself from great bodily harm or death by Rodriguez. See *People v. Rolon*, 73 Cal. Rptr. 3d 358, 367 (Ct. App. 2008) (not taking reasonable steps to protect child may expose one to culpability if "the

purpose of nonintervention is to aid and abet the attack"). Likewise, Petrov's repeated lies to hospital personnel and police investigating the case could be explained by Petrov's fear that she was at risk of death or great bodily harm if she did not lie to protect Rodriguez. Accordingly, because Petrov's testimony about Rodriguez's history of physical abuse was a central issue in this case that directly related to the State's theory of accountability by common design, we cannot say that trial court's reliance on its private knowledge and experience of domestic violence in finding Petrov to be incredible was harmless error.

¶ 69    Finally, the State points out that the trial court expressly stated that even if Petrov's trial counsel had offered additional evidence of Rodriguez's physical abuse of Petrov it would "not have succeeded or in some way dissuaded the Court or negate it." That does not in any way detract from our finding that the trial court's error was not harmless. The State's reasoning is faulty for the obvious reason that Petrov neither had notice of nor an opportunity to challenge the trial court's understanding of the nature and cycle of domestic violence and her reliance on that understanding to discredit Petrov's defense. To be clear, we make no determination on this issue, but only make these observations because we deem the evidence of domestic violence a viable and relevant consideration in determining whether Petrov was engaged in a common design with Rodriguez to murder Angelina for purposes of the accountability statute.

¶ 70    Having found that Petrov's conviction must be reversed because she was denied due process, the next question is whether remand for a new trial is barred by double jeopardy. The double jeopardy clause forbids a second, or successive, trial for the purpose of affording the prosecution another opportunity to supply evidence it failed to muster in the first proceeding. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). Although the double jeopardy clause bars the State from retrying a defendant after a reviewing court has determined that the evidence at trial

was legally insufficient to convict, that clause does not preclude retrial of a defendant whose conviction has been set aside due to an error in the proceedings leading to the conviction. *People v. Mink*, 141 Ill. 2d 163, 173-74 (1990). For purposes of double jeopardy, all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence. See *Olivera*, 164 Ill. 2d at 393.

¶ 71    When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Rather, we "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 72    Petrov argues before this court that the evidence was insufficient to establish her guilt beyond a reasonable doubt because the trial court's formulation of the requirements for criminal accountability omitted the necessary *mens rea* of shared intent as required by section 5-2(c) of the Criminal Code of 2012 (720 ILCS 5/5-2(c) (West 2012)). Petrov also argues that the court misstated the elements of first degree murder by accountability and improperly considered her attempted cover up of the crime to convict her of murder.

¶ 73    Petrov was found guilty of four counts of first degree murder by way of accountability for acts done with either intent to kill or do great bodily harm, or knowledge that the acts would cause death or create a strong probability of death or great bodily harm, and the victim was under 12 years of age and the acts were exceptionally brutal indicative of wanton cruelty. *Id.* § 9-1(a)(1), (a)(2), (b)(7). A person is accountable for the actions of another when, in pertinent part, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." *Id.* § 5-2(c). Accountability is specifically linked to the crime charged, so the intent is dictated by the underlying crime. *Stanciel*, 153 Ill. 2d at 233. Murder is a general intent crime. *Id.*

¶ 74    Petrov's entire argument regarding the sufficiency of the evidence in this case rests on her mistaken belief that the State was required to prove, and the court was required to find, that she shared Rodriguez's intent in order to be guilty of Angelina's murder under a theory of accountability. Contrary to Petrov's argument, the State was not required to prove, nor was the court required to find, shared intent. It is well settled that, under the Illinois accountability statute, the State may prove a defendant's intent to promote or facilitate an offense by showing either (1) that the defendant shared the criminal intent of the principal, *or* (2) that there was a common criminal design. *In re W.C.*, 167 Ill. 2d 307, 337 (1995); *Stanciel*, 153 Ill. 2d at 234-35; *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 75    In cases where accountability is premised on shared intent, the appropriate focus is on what the defendant knew about the principle's criminal intentions, as one cannot share an intent to promote or facilitate the commission of a crime when one does not know that a crime is going to be committed. See *Fernandez*, 2014 IL 115527, ¶ 20 (citing *People v. Dennis*, 181 Ill. 2d 87

(1998), and *People v. Taylor*, 186 Ill. 2d 439 (1999)). In this case, however, Petrov was convicted under the common design theory of accountability. Shared intent is not an element of common design. *Id.* ¶ 21.

¶ 76    "The common-design rule provides that where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *W.C.*, 167 Ill. 2d at 337. In other words, " '[c]ommon design refers to a criminal scheme of which the crime charged is only a part.' " *People v. Jones*, 156 Ill. 2d 225, 239 (1993). Proof of the common purpose or design need not be supported by words or agreement but may be drawn from the circumstances surrounding the commission of the unlawful conduct. *People v. Reid*, 136 Ill. 2d 27, 62 (1990). Moreover, a defendant may be found to have aided and abetted without actively participating in the overt act itself. *Stanciel*, 153 Ill. 2d at 237. In determining whether a defendant is accountable under the common design theory, the trier of fact may consider (1) the defendant's presence during the planning of the crime; (2) his presence during the commission of the crime; (3) his flight from the scene; and (4) his continued association with the principal after the commission of the crime. *People v. Perez*, 189 Ill. 2d 254, 267 (2000).

¶ 77    Although factually unrelated, *People v. Kessler*, 57 Ill. 2d 493 (1974), is a "textbook application of the common-design rule." *Fernandez*, 2014 IL 115527, ¶ 14. In *Kessler*, the defendant and two co-felons planned to burglarize a closed tavern. *Kessler*, 57 Ill. 2d at 494-95. The defendant stayed in the car while the two co-felons went inside. *Id.* at 494. The tavern owner was present when the co-felons entered, and one of the co-felons shot the owner with a gun he found at the tavern. *Id.* at 494-95. The two co-felons ran back to the car, and all three sped away

from the scene. *Id.* at 495. A police chase ensued and one of the co-felons drove the car into a ditch. *Id.* The two co-felons then fled on foot. *Id.* The defendant, meanwhile, stayed in the car. *Id.* As the co-felons were running away from the car, one of them shot at a police officer. *Id.* The defendant was arrested and eventually found guilty of burglary, as well as the attempted murder of both the tavern owner and the police officer. *Id.* at 493-95.

¶ 78     Our supreme court found that the defendant's convictions for attempted murder were proper, reasoning that:

> "the burglary was the offense which the defendant [and his companions] had jointly
>
> planned and were jointly committing, and each was legally accountable for the conduct of
>
> the other in connection therewith. The result was the offense of attempted murder of [the
>
> tavern owner] and of [the police officer] who answered a report of the incident and who
>
> tried to apprehend the fleeing parties." *Id.* at 499.

The court further found that the accountability statute means that "where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses any criminal act done in furtherance of the planned and intended act." *Id.* at 497.

¶ 79     This case is hardly a textbook example of accountability by common design. Unlike *Kessler*, there is no evidence that Petrov planned with Rodriguez to harm Angelina. According to Petrov, during Rodriguez's actual commission of the offense, Petrov verbally protested repeatedly and twice attempted to physically take Angelina from Rodriguez while he had his hand over her mouth and nose. Nevertheless, as we explain below, our supreme court has found that the common design accountability theory was sufficient to sustain a murder conviction based on, as here, the failure to take reasonable steps to protect a minor and subsequent cover-up

to protect the principal offender.

¶ 80    We begin by reviewing the evidence in this case in the light most favorable to the State. There is no dispute that the medical evidence supports the finding that Angelina's injuries and ultimate death were caused by a lack of oxygen to her body. Both Dr. Akbarnia and Dr. Flaherty testified that Angelina suffered from a global anoxic injury caused by lack of oxygen and that there were no visible signs of trauma. Dr. Woertz, the medical examiner, testified that in her expert opinion, Angelina died due to asphyxiation, which is a lack of oxygen. Smothering or placing one's hands over the victim's mouth and nose several times can cause lack of oxygen to the body. Both Dr. Akbarnia and Dr. Flaherty testified that Angelina's injuries were explained by Rodriguez placing his hand over Angelina's mouth and nose several times.

¶ 81    The evidence further established that Angelina was smothered by Rodriguez in the early morning hours of April 11, 2013, which was consistent with the progression of Angelina's injuries. Dr. Akbarnia testified that she could not determine the exact time that Angelina was deprived of oxygen. However, she could say based on the symptoms Angelina presented with that it was most certainly not in the "recent past, because these types of symptoms do not happen within, like, a couple of minutes." Dr. Akbarnia opined that, given the amount of swelling in Angelina's brain that she observed, Angelina would have been deprived of oxygen hours before. Dr. Akbarnia agreed that the injuries could have happened at least 7 a.m. on April 11, 2013, but could have happened before that. Dr. Flaherty also stated that she could not determine the exact time that Angelina was deprived of oxygen, but based on Angelina's symptoms, it could not have happened after 7 a.m. Dr. Flaherty based her opinion on the fact that Angelina suffered severe injury to her brain and would already be demonstrating some of the effects of oxygen deprivation at 7 a.m., although she would not have been as impaired. Dr. Flaherty opined that the

extent of Angelina's injuries on presentation would be explained by her being smothered at 3 a.m. Angelina died on April 15, 2013, a little more than four days after being brought by ambulance to the hospital.

¶ 82    Viewing the evidence in the light most favorable to the State, a common design existed between Petrov and Rodriguez because there were reasonable steps that Petrov could have taken to protect Angelina. Petrov testified that she was present during the three separate instances that Rodriguez put his hand over Angelina's mouth and nose, smothering her and depriving her of oxygen. Although Petrov testified that she verbally tried to get Rodriguez to stop and tried to physically take Angelina from Rodriguez both the first and second time he covered her mouth and nose with his hand, Petrov stood by and watched Rodriguez deprive Angelina of oxygen a third time. She then watched as Rodriguez placed Angelina face down in her bed. She then had sex with Rodriguez and went to sleep.

¶ 83    Nevertheless, a finder of fact could determine that there were other reasonable options available to Petrov to protect Angelina. Petrov testified that she did not seek help during the times that Rodriguez was depriving Angelina of oxygen. Petrov did not run out of the apartment for assistance or seek intervention for Angelina while Rodriguez was depriving her of oxygen, despite being close to the door. Petrov did not wait until Rodriguez went to sleep to check to make sure Angelina was okay or to seek medical treatment. She did not take Angelina and run away. She did not call the police or an ambulance. When she got up at 7 a.m., Petrov asked Rodriguez to check on Angelina. She did not assess Angelina at that point or call the police or an ambulance. Petrov then went back to sleep until 11 a.m. Only then, roughly seven hours after Rodriguez repeatedly smothered Angelina, did Petrov show any concern for Angelina's health. Even then, Petrov did not attempt to obtain medical attention until 12:21 p.m. when she called

911.

¶ 84    Again, our courts have long recognized that custodial parents have an affirmative duty to protect and provide for their minor children. *Stanciel*, 153 Ill. 2d at 236 (duty of parent to protect young child recognized over a century ago); *People v. Pollock*, 202 Ill. 2d 189 (2002); *People ex rel. O'Connell v. Turner*, 55 Ill. 280 (1870); *People v. Bernard*, 149 Ill. App. 3d 684, 694 (1986); Wayne R. LaFave & Austin W. Scott Jr., Criminal Law § 3.3, at 203 (2d ed. 1986). "A parent who knowingly fails to protect his or her child from abuse may be prosecuted under the accountability statute and, thereby, becomes legally accountable for the conduct of the abuser." *People v. Peters*, 224 Ill. App. 3d 180, 190 (1991), *aff'd Stanciel*, 153 Ill. 2d 218.

¶ 85    The State relies on our supreme court's decisions in *Stanciel* and *Pollack*. In *Stanciel*, 153 Ill. 2d 218, our supreme court considered the consolidated appeals of two mothers, each of whom was held accountable for the murder of her child by a live-in boyfriend. Pursuant to the affirmative duties of parents to protect their small children from threats by third persons, the *Stanciel* court found the mothers accountable for the murder of their children because the mothers knew of ongoing abuse by their boyfriends and continually sanctioned exposure of the children to the abuse. *Id.* at 236-37. The court found that, while the mothers did not aid the principals in the pattern of abuse that resulted in the deaths of the children, the evidence presented against the mothers was sufficient "to provide the inference that they both either knew or should have known of the serious nature of the injuries which the victims were sustaining." *Id.* at 237. "[T]he defendants had an affirmative duty to protect their children from the threat posed" by their boyfriends but did not and, instead, entirely ignored the dangers and thereby aided the boyfriends in murdering the children. *Id.* The supreme court specifically concluded that intent remained a requirement of accountability and that guilt must be proven through the knowledge

and sanction of a danger. *Id.* at 238.

¶ 86    In *Pollock*, our supreme court clarified the language in *Stanciel* regarding the *mens rea* required for parental accountability. In *Pollock*, the defendant was the mother of a three-year-old girl who was murdered by the mother's boyfriend. *Pollock*, 202 Ill. 2d at 192. The boyfriend admitted that he had caused the child's death, and he told police that the mother was unaware of his actions. *Id.* at 203. Nevertheless, the mother was convicted of first degree murder and aggravated battery of a child based on a theory of accountability. *Id.* at 209. There was no evidence presented at trial that the mother abused her child or that the mother was present when her child was abused or was even aware of any abusive acts committed by her boyfriend. Relying on language from *Stanciel*, the State tendered the following nonpattern instruction, which the trial court allowed and read to the jury: " 'A parent has a legal duty to aid a small child if the parent knows or should have known about a danger to the child and the parent has the physical ability to protect the child.' " *Id.* at 208. The defendant was found guilty of felony murder and the predicate felony, aggravated battery of a child which was based " 'not upon her own direct action, but upon her failure to act to protect her child from the actions of her live-in boyfriend.' " *Id.* at 209.

¶ 87    On appeal to the supreme court, the court stated that it was a misconstruction of *Stanciel* to assert that a parent's legal duty to protect his or her child may be imposed if the parent does not know, but should know, of a danger. *Id.* at 215. The court explained that the term "knew or should have known," as used in *Stanciel*, was in reference to the mother's awareness of the severity of the injuries sustained by her child, not the mother's awareness of the existence of the abuse. *Id.* The court concluded,

> "that a parent may not sit idly by while another person abuses her child. Parents

are required to intercede on their child's behalf and, if they fail to act, they risk being held responsible for the other person's criminal conduct. By failing to act, the parent may be deemed to have implicitly sanctioned the criminal behavior and, therefore, may be held accountable for the abusive conduct. Even in situations where the parent is not present at the time when the abuse resulting in death takes place, the parent may be held accountable for the criminal conduct resulting in death, if it is proved that the parent knew that the child had been abused by the principal in the past and, because of the nature of previous injuries sustained by the child, also knew there was a substantial risk of serious harm, yet took no action to protect the child from future injury by the abuser." *Id.* at 215-16.

¶ 88 Here, the State's theory was that Petrov knew that a crime was being committed when Rodriguez smothered Angelina, Petrov had a duty to protect Angelina, and Petrov's omission— *i.e.*, failure to protect Angelina—was the "aid" necessary to find the requisite intent. Again,

"[w]hen proof that a parent aided and abetted an offense is to be deduced from an omission to act, the parent must know of a serious and immediate threat to the welfare of the child. That is, there must be evidence from which it can be inferred that the parent knew that the child was sustaining injury and, based on the severity of the injuries being sustained, knew that there was a substantial risk that death or great bodily [injury] would result if the parent did not act to protect the child." *Id.* at 215.

Parents cannot "sit idly" by while someone abuses their child but "are required to intercede on their child's behalf and, if they fail to act, they risk" criminal culpability. *Id.* at 215-16.

¶ 89 While *Stanciel* and *Pollock* are the seminal cases on a parent's duty to act to prevent abuse of their child and provide the basis on which we find Petrov had duty to aid Angelina,

neither *Stanciel* nor *Pollock* dealt with a situation where the mother alleged that she was the victim of domestic abuse at the hands of her codefendant, the victim's biological father. There was no allegation of domestic violence or discussion at to what consideration must be given to the codefendant mother's ability to provide aid in either case, where she was afraid for her life based on the prior abuse that she suffered at the hands of her codefendant. We are not aware of any Illinois precedent with these fact circumstances.

¶ 90    Petrov testified that she knew that she should have stopped Rodriguez. She also testified that she knew that as she watched Rodriguez put his hand over Angelina's mouth and nose three separate times, depriving Angelina of oxygen, that something "bad" and "dangerous" could happen. Petrov acknowledged that she knew she had a duty to protect Angelina. A reasonable trier of fact could find that not only did Petrov fail to aid Angelina at the time she was actively being deprived of oxygen, and during the time she remained at home, but Petrov also failed to inform medical personnel of the cause of Angelina's injuries. Furthermore, a fact finder could conclude that Petrov colluded with Rodriguez and, together, they concocted a story to keep the truth about what happened to Angelina a secret. The evidence could support a finding that Petrov further perpetuated that collusion and continually lied to medical personnel and police investigators about the cause of Angelina's injuries for 40 hours, all the while attempting to protect Rodriguez and herself from criminal liability.

¶ 91    Petrov does not dispute that she was present during the perpetration of the offense, maintained a close affiliation with Rodriguez after he smothered Angelina, and failed to report the crime. These factors are properly considered in determining Petrov's legal accountability under the common design theory. *Perez*, 189 Ill. 2d at 267 (under common design theory, "[p]roof that the defendant was present during the perpetration of the offense, that he fled from

the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability"). Accordingly, viewing the evidence in the light most favorable to the State, we find that the trial court could have concluded that Petrov's failure to take reasonable steps available to her to protect Angelina, and her subsequent cover-up attempts, aided and abetted Rodriguez and were therefore sufficient to find Petrov guilty of first degree murder by accountability under the common design theory of accountability beyond a reasonable doubt.

¶ 92    Support for our conclusion can be found in *People v. Burton*, 338 Ill. App. 3d 406 (2003), which has similar facts. In *Burton*, three-year-old Dominique was drowned in the bathtub by her father, Leroy Locke, as her mother, Sharon Burton, looked on. *Id.* at 414. Both were convicted of first degree murder and sentenced to natural life. *Id.* at 408. On appeal, the court found overwhelming evidence to support the jury's verdict of first degree murder for Burton by accountability. *Id.* at 414. Burton knew that Dominique had been injured by Locke and knew or should have known from the severity of the injuries that Dominique was at substantial risk for death or great bodily harm. Dominique had previous injuries, including burns, abrasions, and bruises. More importantly, the evidence showed that Burton was present in the bathroom when Locke held Dominique's head under water three times but did nothing to assist Dominique or stop Locke. Afterward, she left Dominique unattended in the bathtub after she had been repeatedly held underwater while she and Locke played cards in the next room. *Id.* When she later removed Dominique from the bathtub, Burton called her mother instead of 911. Rigor mortis had already set in when the paramedics arrived. Burton lied to the paramedics, the police, and social workers when first questioned, telling them that Dominique fell off the toilet and she

found her unconscious. *Id.*

¶ 93    The court found that the evidence sufficient to support Burton's conviction for first degree murder by accountability under common design based on the facts that Burton maintained a close affiliation with Locke after the commission of the crime and failed to report the crime. We noted that "[a]s in *Stanciel*, there is sufficient evidence here to support the inference that Burton's failure to act aided and abetted Locke's offense." *Id.* (citing *Stanciel*, 153 Ill. 2d at 232). The court reversed Burton's conviction based on an improper jury instruction that allowed conviction if she should have known about the abuse but found the evidence sufficient for double jeopardy purposes.

¶ 94    For purposes of the double jeopardy bar, viewing the evidence in the light most favorable to the State we cannot find that there was insufficient evidence to convict Petrov. The fact finder could have found that Petrov had a reasonable opportunity to offer aid, to remove herself and Angelina from the room, to enlist the help of family members, to seek immediate medical attention, and to notify authorities. See *Bernard*, 149 Ill. App. 3d at 694 ("Inasmuch as defendant was charged under the theory of accountability, the omission to perform the duty to protect her children from harm was an integral element of the offense with which she was charged."); *People v. Ray*, 80 Ill. App. 3d 151, 157 (1979) (common design proven where evidence showed that the defendant did not call or go to the police station to report crime that her daughter was being physically abused by her boyfriend, did not accompany the body to the hospital, and when she went later, she initially stated that she did not know how the injuries were inflicted). Likewise, there was evidence of opportunities for Petrov to inform medical treaters and police, outside of Rodriguez's presence, that Rodriguez deprived Angelina of oxygen.

¶ 95    Again, our holding today is simply that, for purposes of double jeopardy, when we view

the evidence in the light most favorable to the State, a reasonable fact finder could conclude that Petrov did not take every step reasonably available to her under the circumstances to prevent harm to Angelina. Therefore, the evidence supports a finding of guilty of first degree murder under an accountability theory for purposes of double jeopardy.

¶ 96    We turn to Petrov's argument that to be guilty of murder under an accountability theory, the "required shared intent" must occur either before or during the commission of the offense and not after the fact by concealing evidence or hindering the principle's apprehension. Once again, Petrov's argument supposes that shared intent with Rodriguez was necessary to a finding of guilty under a theory of accountability. Moreover, as we previously discussed, in common design cases, "where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses any criminal act done in furtherance of the planned and intended act." *Kessler*, 57 Ill. 2d at 497. "Although it is generally true that the proof tending to show one to be an accessory before the fact would be events occurring before the inflicting of the fatal blows, evidence of subsequent acts is nonetheless competent to prove participation in [common design]." *Ray*, 80 Ill. App. 3d at 157. A common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). And, as our supreme court has held in *Perez*, 189 Ill. 2d at 267, "[p]roof that the defendant was present during the perpetration of the offense, *** that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability."

¶ 97    Here, Petrov was present during the commission of the crime, maintained a close affiliation with Rodriguez after the crime, and lied to medical providers and police to protect

Rodriguez. In addition, a reasonable fact finder could conclude that Petrov did not take all steps reasonably available to her to protect Angelina from Rodriguez. Viewing the evidence in the light most favorable to the State, the evidence supports Petrov's conviction for first degree murder by accountability, and there is no double jeopardy bar to retrying her. However, our view of the evidence for purposes of double jeopardy is not binding on retrial, and we express no opinion concerning Petrov's guilt or innocence.

¶ 98                                        CONCLUSION

¶ 99      Based on the foregoing, we reverse and remand for a new trial before a different judge.

¶ 100   Reversed and remanded.

---

*People v. Petrov*, **2023 IL App (1st) 160498**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-09909-02; the Hon. Maura Slattery Boyle, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Richard H. McLeese, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |